Good morning. Good morning, Your Honor. May it please the Court. I represent Siva Barama, and I'd like to reserve three minutes for you. How many? Three. Okay, thank you. Three, Your Honor. So today, I'd like to talk about two of the issues in the brief. First, whether there was sufficient evidence to sustain the convictions for securities fraud under 1340. Could you get a little closer to the mic, or maybe we can turn it up a little bit. As you know, the acoustics in here are. Usually, I'm very loud. Now you're good. It's unusual. Okay. You're good now. That's never been a problem. Anyway, I would like to first to, I'd like to address the two issues. One, going to the sufficiency of the evidence under 1348-2, and the second, the question of this constructive amendment by including the language regarding omitted facts. So the defendant's conviction cannot be sustained based on his misstatement of his trading volume to the person who was himself the embezzler. And I think it's important to look at what the jury did in this case. The jury did not the jury acquitted him of conspiracy. So we can't have a basis for liability. You know, there's no Pinkerton liability here. And the jury essentially said, well, we can't find that he was in a conspiracy with the center, the TIPOR, the insider, which Mr. Nallor, who actually got the confidential information from Palo Alto Networks. And in fact, this is also not a case, a traditional TIP or TIPI case, where we can say, well, the TIPOR, you know, got a benefit from the TIPI, because he didn't get any benefit. He, for some reason, he wasn't even friends with Mr. Nallor. They started out working together. They had tea occasionally. My client left, and then he, you know, called him up and said, you know, texted him and said, I'd like to get some. Counsel, as you know, as an experienced lawyer, we have a paucity of guidance in this area about what the TIPOR has to benefit from, if at all. Right. And as you know, the Second Circuit's got all over the place on it. We have very little on it. What's your best argument that in our situation here, that the TIPOR must or must not receive a benefit? And if so, what kind of benefit would qualify? Well, I think it's clear. That's actually, I mean, that's not my argument, but I'd like to answer your question. So I think that it's not clear if that rule still survives under 1348, because it's a different statute than 10b-5. And the Dirks holding, which said there has to be a benefit, is under 10b-5. So, but I think the problem here is more, but in this Court and the Supreme Court in Salomon has said, well, it has to be, it doesn't have to be like a monetary benefit. It can be a monetary benefit. It can be something like you give your family or friend some, some misappropriated information and they use it to trade on. That's just the same as giving a gift. And that would work if the two men had a relationship here, but they didn't, really. They weren't friends. They didn't socialize. So why did he give them that information? We don't really know, Your Honor. We really, I mean, it's, I don't know. I mean, I could be wrong. I don't know. But really, that's not the question here. I think the point is, is, did, did my client do something that brings him within the rubric of 1348-2, which requires a means, you have to use a means of false pretense as a false statement? So suppose, imagine a case where the defendant, say, you know, has a friend who is, you know, at an investment bank or something and has lots of inside confidential information. And he says to his friend, you know, I'm, I'm interested in academic study of the securities markets. And, you know, I, I want to test the strong form of the efficient markets hypothesis. So, so please give me the inside information that you have and I'll study it. I'm not going to trade on it. And the friend then gives him the inside information. But in fact, he goes out and trades on it. Has that defendant violated 1348-2? I don't think so. See, I think those are, Why not? Why not? Because the false statement he made is not to the victim. He didn't make it to But he, he, he obtained, it says, to obtain by means of false or fraudulent pretenses. So there's a false statement there, right? Right. There's a false statement. And he has to obtain any money or property. And Carpenter says that confidential information is property.  So he's obtained money or property by false or fraudulent pretenses. And it has to be in connection with the purchase or sale of a security. But he was doing it to trade securities. So what, what's missing? I, I guess I have to, I guess I have to concede to you there. I think that would be. But I Okay. Then my question is, what's, what's different to your What's different about my case? I think what's different about this case is that the, at least, and again, this is the, is part of the argument, it's at least as to counts to, not counts, counts the three through five. There were no false statements. There was just omissions in his exchanges with, with Nalor. Well, but the, I mean, so on a sufficiency challenge, right, we have to draw all inferences in favor of the verdict. And the jury could have inferred that this whole scheme never would have gotten going if he had said at the outset, like, I'm going to be placing large volume trades on this information when you give it to me. But it's still an omission, Your Honor. It's still an omission. He Well, there was an affirmative false statement as to the amount of money in his account, right? He said, I have $22,000 in the account. It may not have been affirmatively false. It may have been true for one account. He had several accounts. So, I mean, I don't think that that is, that is not, I mean, again, we're in this gray area. What's an affirmative? I mean, how, how precise do we have, how precise does my client have to be? Well, that's where you run into the presumption, isn't it? I'm sorry? Isn't that where you run into the presumption in favor of the government?  Okay. Well, yes and no. I mean, that's, I suppose you can say that, but again, we still, and again, I still come back to the, I would concede that he would have been guilty under, and I, frankly, it's difficult to understand the verdict. I mean, the Under the conspiracy charge? Oh, well, not the conspiracy charge. Well, No, but under one. I know he wasn't guilty. Right. I mean, the jury found, the jury found it. You were going to Yeah. My question is, do we even have to look to his lie? I think there was an aiding and abetting charge also, right? So all these are under the aiding and abetting theory. And so he doesn't have to personally lie as long as, I forget the other guy, gentleman's name.  Nallor had lied.  And then he could be charged for those lies. He could, again, under the scheme to defraud, but, or even under the second part. But the problem is you have to have aiding and abetting. How did this client, how did Mr. Barama's misstatement, if such it was, to Nallor aid and abet the fraud? It didn't aid and abet. Well, it induces him to continue to pass on tippy information, insider information. But that's not the, but it doesn't, well, I think that that's not quite the, I think he has to do something that induces the scheme, because the scheme was getting information from him from Palo Alto Networks. And it wasn't just giving it to him. That wasn't the charge scheme. It was this whole, you know, it was every, there were unindicted co-conspirators in this case. Right. But it just seems like if Nallor keeps on giving him inside information, something that he is doing is inducing that, right? That's just other, it makes no sense otherwise. Except that I think that there's really, I suppose that, I'm not sure that that's the case. I think that Mr. Nallor was, honestly, I don't know why he gave him the information, given that they didn't have a personal relationship and he wasn't getting anything out of it, perhaps for some kind of ego-driven. Counsel, you've said that a couple of times. They had no personal relationship. Perhaps I misunderstand, but I thought that the evidence showed that because these folks had a, they came from the same general area of, I believe, India, they had all kinds of cultural connections. They had lunch together. They had tea together. They talked about a lot of different things. How can you say they had no relationship? Pretty easily, because Nallor testified that they never had lunch together. They had tea on occasion. They, the commonality that they have was they were speakers of the same language, but they did not socialize. They did not. You mean that when you have tea together, you're not socializing? Well, they didn't socialize together outside of work. They only worked together for a very limited period of time, and then Mr. Barama left. But they claimed, they claimed offenses occurred after they were working at different places, right? That's right. That's right. But they did not, but again, there wasn't, they didn't have a social relationship in the sense that they communicated only about trading mostly over text message and WhatsApp. They didn't, I'm just watching my time here, they didn't, you know, they didn't like, unlike, especially when you compare him to the other people that Mr., that Nallor gave information to, he had, he was friends with them, their families hung out together, they visited each other, they had, you know, they had longstanding relationships. He traded in their accounts. They opened accounts for him. It was much, you know, a much stronger case. So, counsel, you would agree if your client paid Nallor money, then that would easily meet the aiding and abetting.  So why couldn't we say that something, why couldn't the jury find that something in their relationship, you know, even though it's not a monetary gain, led Nallor to continue to give him insider information? Well, I think that would really require that there was some, some psychological need on Nallor's part, and I don't think that is witness- Yeah, I guess I would say there is enough evidence of some sort of relationship that clearly induced him to do this. And so, you know, given all, in the light most favorable to the jury, why couldn't they find that there is an inducement there, therefore, you don't even have to rely on your client's specific lies. You could rely on Nallor's lies. Well, I don't, there's just no evidence. There's just not enough evidence of that. There's some evidence of some relationship. I mean, it's sort of, you know, it's sort of, I mean, I think it's just too vague and weak. It doesn't meet the standard that the Supreme Court set. I mean, this, if you look, if you look at Salman, which is the more recent case on tipper-tippee liability, they, there were still, you know, it was, it was a familiar relationship where you could say, well, it was a gift. But there was something to back it up, and they still stood by the holding in  But, again, forgive me, I, my wife and I were in India about a year ago, and I learned that there are over a thousand languages in India. The only common one is English, and they even have different movies filmed in different parts of India because people don't understand the other. But these two knew each other. They understood each other. They had the same language. There was a connection. Isn't that enough? No, Your Honor, because Telugu, as a matter of fact, is actually one of the most commonly spoken tongues in India. It's a, it's a very, it's spoken by a very large proportion. Telugu and Hindi are probably the two most commonly used languages in India. Could the jury have understood something different? In other words, could they have understood that, wow, here's somebody who understands me, understands my language, and they had a connection that way. Is that enough? Your Honor, I'm not going to agree with that, especially given the other evidence in the record that he didn't, especially when he listened to Nallora's testimony about his lack of a relationship with Mr. Khan. Do you want to say, you said three minutes. I do, I do, so I will sit down.  Thank you, Your Honor. Okay. All right, let's hear from Mr. Farnham. Good morning. Good morning, Your Honors. May it please the Court, my name is Lloyd Farnham, appearing on behalf of the United States. This Court should affirm and find that the jury convictions were supported by sufficient evidence here. Barama does not dispute that the evidence at trial proved that he made profitable trades based on the confidential business information. He doesn't dispute that he knew that the information was confidential, and contrary to Nallora's promises that he made to Palo Alto Networks to keep it confidential, they don't even dispute that Barama acted with an intent to defraud, an intent to deceive and cheat. We're only talking about the false pretenses in their brief, and that's what I heard today about the appellant's argument. But the evidence for that, the sufficiency argument here, can be more direct even than Barama's false statements to Nallora. The most direct theory of sufficiency here is that Barama himself executed a scheme and artifice to obtain the money or property by false pretenses. Because his scheme depended on Nallora's false pretenses to Palo Alto Networks. Let me ask you this. As I understand it, Barama didn't tell Nallora how much he was trading. Do you agree with that? That's correct. The quantum. He misled Nallora about the volume and the extent. Does that not support his argument that the jury could have improperly convicted him based on the omitted facts language in the jury instructions? Well, I would characterize what Barama did to Nallora about his trading volume as misleading him. I think you can always look at some misleading conduct and deceptive conduct as omissions, but you can also look at it as affirmative acts. And here, before the trading scheme, before the trading and the charged counts, Barama affirmatively told Nallora a lie about his trading volume. And particularly in August 2016, Nallora asked him what he had traded. He said five contracts. Nallora understood it to mean five contracts. That was false. It was many times more than that. Let me be more specific then. What role, if any, did the, in quotes, omitted facts in the jury instructions play according to the government? Sure. This is the phrase and omitted facts that was, on the government's part, inadvertently left in that instruction. It wasn't objected to, right? Well, my position is it was waived by the defense because they actually proposed that same instruction, but at the very least it was forfeited and so would be reviewed on plain error. Those three words don't, they certainly are not a constructive amendment because it doesn't materially change what was alleged in the indictment and the proof at trial, the government's theory, the government's arguments. The appellant has challenged those words on a constructive amendment grounds, and I think that it's far from that standard. Certainly on plain error, the appellant can't meet that argument. I don't think that made a difference because the government didn't pursue that theory. We didn't talk about omitted facts anywhere in the evidence or in the argument. What we talked about was that Nallor used and disclosed the confidential business information of Palo Alto Networks, contrary to his explicit promises to keep it confidential, and that he feigned loyalty, that he feigned adherence to those promises in order to gain continued access to that information. That was the evidence and that was the theory, and so the inclusion of the omitted facts in that jury instruction, I don't think it made a difference, and it didn't affect his substantial rights. This is maybe only tangential to the omitted facts issue, but is there any evidence in the record from Nallor that said that if he had known that Barama was trading millions of dollars, he would not have shared any more of the confidential information, or is that just speculative? It's inference. So Nallor did not directly testify to that, but he talked about the fact that he was surprised. He talked about the fact that he was misled about the trading volume, and Nallor also, his trading was much more conservative and often in other people's accounts in order to conceal it. So the inference that, as I recall, he told Barama, you need to keep this small so we don't draw attention, right? Or is that just an inference? That's an inference. I don't think there's direct testimony of Nallor on that question. So there's nothing in the record that you can say that Nallor definitely would not have provided additional confidential information if he had known the quantum of trades in which Barama was engaged. That's correct, but I don't think direct evidence is necessary on that. I think it's a fair and— It's an inference. On sufficiency, it's an inference from the testimony. So you're starting off saying that your theory is that it all depends on Nallor's lies to Palo Alto, correct? So under aiding and abetting theory, is that right? I think that's a direct executing a scheme and artifice to defraud, Barama executed a fraud that depended on those false pretenses, but we also have aiding and abetting. I think those are two ways to get to the sufficiency question. Wait, so you're saying you don't need aiding and abetting. What's your theory on that? On without aiding and abetting? Yes, without aiding and abetting, how do you depend on Nallor's lies? So the scheme or artifice that was executed by Barama, there are two ways to think about that. One is a direct execution of a scheme that depended on false pretenses that Barama was completely aware of. This would be a different situation if Nallor was using false pretenses that Barama was unaware of, but he knew that the scheme depended on Nallor's false pretenses because, of course, Barama was a former employee under the same obligation. So you're saying knowledge of the false pretenses is enough? Additionally, with all the other elements. Yes, that's correct. But I don't know, is there cases that say that the false pretenses or lies can be done by someone else as a direct offense? Well, I've been talking about direct liability, I think, that he executed. I also think that co-schemer liability under the federal fraud statutes under Title 18 is another way of thinking about primary liability. And here, at the very least, even if he didn't directly execute a scheme or artifice that depended on Nallor's false statements, he was a co-schemer with Nallor. What statute are you referring to, the co-schemer liability? The best case would be the Stapleton case. And that establishes that under mail and wire fraud, there's this concept of co-schemer liability. And if you participate in a scheme... What's the difference between aiding and abetting and co-schemer liability? Aiding and abetting is under Section 2 and so has specific statutory and legal requirements. Co-schemer doesn't necessarily rely on aiding and abetting. It's the idea that you are responsible and culpable for the acts that you don't directly commit but that you know are happening and that are part of the scheme. And how is that different from Pinkerton? Pinkerton would be more like a conspiracy.  And you'd have to have the agreement to... So you can be a co-schemer without proof of agreement? I think you can. I think if you act in concert, if you know all the things that your co-schemer is doing and you are actively participating in the scheme, you can be a co-schemer. That's hard to square with the jury found no conspiracy, but interesting. But you also put forward an aiding and abetting theory, right? Yes. And how does that work? What inducement was there? So Brahma reached out affirmatively to Nallor to engage in the conversation. And from the first conversations they had, they talked about financial information and the performance of Palo Alto networks. Repeatedly, Brahma reached out to Nallor to get that information. And in addition, he made the false statements about his trading volumes that we talked about previously in order to actually induce Nallor to provide the information. The other interesting part of this is... Can I just ask you on that? The false statement, the one that you mentioned a moment ago, was about the first trade and the volume that he had traded. That was after the trade that he made that statement. Do I have the chronology right? I believe that's correct. By that point, he already had the information. So how did that induce the sharing of the information that had come earlier? It would have... Well, so they actually didn't... During that, we didn't charge. That was not a charged count. The August 30th, 2016, how many did you buy? That time period was not a charged count. The first charged count was November, an earnings release in November 2016. So those lies were actually before all the charged trading. So that's another inducement to Nallor to provide the information and continue to provide it for each of the quarters that were charged counts. Did the government have a theory on why Nallor provided all that information to Barama? I think the clear inference is that it was a gift of valuable information. He was providing it in order to provide a benefit to Barama. As a friend or kinsman? What's the theory? I would call it a close personal relationship, certainly sufficient under insider trading law for the personal benefit analysis, although I don't think that is necessary and applies here. But if we're talking about why he gave it to him, Nallor did testify, quote, we were not friends. But if you look at the facts and circumstances of their relationship, it was long-term. They were from the same area in India. They spoke the same language. They connected at work. And they reconnected after he left Palo Alto Networks. And they spoke frequently, hundreds of times, by phone and text over the next two years. That is a close personal relationship. Nights and weekends they were talking about trading and other things. It's certainly enough for the jury to infer that that's what was involved, right? I think that's correct. And I think that provides a significant motivation for why Nallor was providing the information. It was a gift of value to Mr. Barama, significant value, it turns out. I'd kind of beg credulity to suggest that when there are hundreds of contacts over a period of time, they had no relationship. It just doesn't make any sense. I would agree with that. I'd like to briefly talk about the – well, let me briefly talk about the materiality – excuse me, the personal benefit element. We argued in the brief that that is not an element required for a 1348 securities fraud. I think that it's the reasoning of Blazak in the Second Circuit is compelling, and this Court should follow that. There really is just the plain reading of the text and applying the federal Title 18 fraud principles here, as we should, for 1348. There's just no reason to add the additional element of a personal benefit. Let's just say you're right. We don't have controlling law right now. Under plain error, if you're correct, they were okay because the law wasn't plain. Even the Second Circuit has different views about it. But do we need to reach this issue about whether personal benefit is – that the TIFOR is required, or can we just go on plain error? In my view, it's plain error. In other words, do we need to write an opinion that says that for the Ninth Circuit that you don't have to have a direct personal benefit? I don't think you need to reach it, I think, on a plain error review. Why didn't he – or why do you think that he didn't request that? Because in his proposed instructions, looking at 1178, he says that the indictment says Nallor tipped the traders for his own benefit, and then they say that that conduct should be included in the jury instruction. So it seems like a request for an instruction about personal benefit. Well, I think it was on a different grounds. So the indictment actually said that Nallor – a factual allegation, Nallor tipped other traders, including Barama, quote, for his own benefit and the benefit of others. That was a factual allegation. I don't think that was a legal requirement. It was not recited in the count language. So as a factual allegation, that was made in the indictment. And the argument that the defendant made at trial, that Barama made at trial, was that that was why it should be included, not because there is this additional element that should be imported from Dirks and the Title 15 insider trading cases. That wasn't the argument. And so I think they forfeited the argument that they're making now, and I think it should be on plain error. Finally, I'd like to address sentencing briefly. I think that for the reasons we made, arguments we made in our brief, that using the gain here is a reasonable calculation of loss, not only under the commentary, which should be binding here because it does not conflict with and is not inconsistent with. What role, counsel, does the fact that the Sentencing Commission ultimately took the commentary and put it into the text of the guidance, what role should that play in our decision on this issue? Well, of course, the old guidelines would be applicable here, but it does point to the reasonableness, I think, of the idea of using gain instead of loss when there is a loss and you can't calculate it. I think it goes to the reasonableness, as does the concept in Section 2B1.4, where in Title 15 insider trading cases the Sentencing Commission said loss is too hard to calculate in these cases and you should use gain. I think that also goes to the reasonableness of using this profit, I wouldn't even call it gain because it really is the profit, the conversion of the valuable information into money. Just real quick, I think the government pointed out there was other cases that are pending on this issue and should we wait for those in the Ninth Circuit? I'm not aware of what those cases are, so I apologize. I think there's other cases dealing with how Kaiser applies to the guidelines and things of that nature. In your view, who suffered the loss? Was it Nalora's employer or was it the counterparties to Barama's transactions? Under a 1348 securities fraud theory, the government's theory is that the company who had the control of the information and had the right to keep it confidential suffered the loss, and that was an economic loss because the company, they were not doing it for any other reason than economic reasons to maintain the confidentiality of that information, and so our theory is that it was a loss to Palo Alto Networks, but very difficult to quantify. Right, so I guess one way of thinking of it I had been thinking was the counterparties suffered a loss because they sold not knowing that it was about to go up or bought not knowing it was about to go down. And there, the loss exactly matches the gain, but if you're thinking of it in terms of the company's information, why is there any relationship? The information has some value to the company, but I don't see, why should we think that has any relationship to how much gain Barama was able to make by trading on it? It just seems completely arbitrary. It is a reasonable estimate, and it is to the value of the information because that's what was taken from Palo Alto Networks. An analogy that I've thought about in this area, if you think about a fraudster tricks a family out of a priceless family heirloom that cannot be assigned a dollar value to the family. Fraudster sells it at an arm's length auction for a million dollars. I don't think that there would be any question that if we had to assign a monetary loss to the family that we should use the value that the fraudster sold it for, a million dollars. And that's a similar thing here. I think at the very least we could say that the value of the information was what Barama was able to convert it for. A better trader or someone with more access to capital might have made even more money, but at least it's worth the $6.6 million here that Barama was able to use to convert the information. Do either of my colleagues have additional questions? Thank you. All right, thanks very much. Thank you, Your Honors. All right, Ms. Landau, you have a few minutes of rebuttal. I just want to address a couple of points. So one of the judges, and I think it was Judge Momotai, you asked about is knowledge of false pretense is enough. And I don't think it is. And I also think it's important to say, well, because if you look at so most recent case that sort of addresses this is Millhiser, which said, well, you know, a false — first of all, a false pretense isn't enough. Even if you get what you want from it, it has to go to the nature of the bargain. And I think that, you know, there's a difference — it sort of plays into the fact that, like, if you're looking at mail fraud, for example, you judge each count individually even though there's a scheme. So here we have securities fraud. We have no conspiracy because the jury said acquitted him. And we have these four counts. So how does the — and I — you know, how does a false statement as to quantity on one, how does that translate to the other, unless you can find that there's some — that there's some kind of — there's something that — I mean, basically, here's what we have is there's no honor among thieves. And so why would, you know, Nallor, who said he didn't consider Barama a friend, is that even — is it even reasonable that he would have believed that he was trading in a court? Well, Counsel, with respect, you know, we all have relationships we have with people. This is a situation where Nallor and Barama apparently hundreds of times communicated. They had tea together. How can you say there was no relationship? They only — and here's the thing. They had tea together when they worked together, not thereafter, and they only communicated in these text messages and only about money. Is that a personal relationship? I don't consider my financial — What kind of relationship is it? I don't know. It certainly was a relationship, right? Well, any relationship is a relationship. I mean, I have a relationship with one of my financial advisors. I call her when I want her to trade for me, but I certainly don't — I don't consider it a personal relationship. Do you need a personal relationship in this setting to — No, I don't think you do. But — There was something here. Well, I'm not going to convince you on that, so I'm going to move on. Can you talk about that loss issue? Actually, yeah, sure. I'd be happy to talk about that. So — well, actually, one other point. The personal benefit, it's not plain error. Plain error review, the request for the jury instruction was made. We look at plain error review on a claims basis. We don't have — you know, the fact that he may not have argued — may not have presented the right — cited the exact right case is not — Well, it's not just not citing the right case. I mean, you — first of all, did you propose specific language for the instruction that you wanted on that point? No. Because I didn't see that in the — Well, I was in trial counsel, so I don't — it wouldn't have been me. But I don't honestly recall, Your Honor. But I do recall there was a lengthy memo about why it should be.  Well, okay, it was a lengthy — but the relevant portion of the memo was not lengthy. And it quoted the sentence from the indictment and said, the conduct alleged in the indictment should be included. But didn't — nothing about, you know, because an element of the offense is that there be a benefit to the tipper. You know, honestly, I don't recall, Your Honor. But I do recall that she — that trial counsel cited the relevant case. And I could be wrong. I may be misremembering, but that was my memory. And what is, from your perspective, the relevant case? It would be Chiarella or Dirks. But — I get that. But — If you cite those cases — It's all over the map, though. Other people have interpreted it differently. No, but if you cite Dirks, you know that that stands for that there has to be a benefit to the — the tippee has to give a benefit. And it can be five-setting. Yeah. I mean, that's what the holding is. It's, you know, that's sort of what it stands for, you know. You know, you asked about gain. So that's a really — it's a long and complicated issue, but I guess I would sum it up by saying the Ninth Circuit has held that Kaiser applies to the guidelines in Castillo. And so have several other circuits. There's a three-way split. The Ninth Circuit has also said that loss can be ambiguous. So you could turn to the commentary. But still, under Kaiser, the term loss, you know, any ambiguity, there has to be — there's a zone of ambiguity.  And as I argued in my brief, gain does not fall in the zone of ambiguity. Can the law be plain if it's ambiguous and you've got all these different views? Well, it's not plain error because this was raised at sentencing, so we're not on plain error review. And I think — and so, A, the issue is preserved. So that, I think, answers that. Why not? I mean, forgetting the commentary and the Kaiser question, if the district court just has to figure out what's the best approximation of loss, we don't know exactly what the value of the information to the company was, but why isn't it reasonable to think, well, it would have been worth at least as much to them as what he was able to get out of it? Well, I think you could say that if — well, first of all, I guess — so we're stuck with the guidelines, right? We have the guidelines. The guidelines say a reasonable estimate of loss. And you're only supposed to — And so my question is, why isn't it in this context? Well, why isn't it? Because the government is — it's really only when loss can't be estimated. And the government didn't even try to estimate loss. And I've been in other cases where — not securities fraud cases, but comparable cases where, for example, you know, like — okay, I'll just give you an example. I represented a guy who hacked LinkedIn. And he — and they had — and they decided not to bother estimating the amount of loss. But, you know, they could have said, well, he made this much money, but they couldn't do that. And so those are the steps. So here the government was just like, well, we'll just use gain because it's easy. And that's not what the guidelines require. Okay. Your time is up. Let me ask my colleague, does either of you have additional — All right. It's a fascinating issue. Thank you. We thank both counsel for your argument. And the case, the case just argued, is submitted.
judges: SMITH, MILLER, BUMATAY